**SECOND DIVISION**
**BARNES, P. J.,**
**BOGGS and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 20, 2016**

# In the Court of Appeals of Georgia

A16A0970. HARRIS v. THE STATE.

BARNES, Presiding Judge.

Timothy Harris shot and killed a man inside his house, and was tried on several counts of felony murder, aggravated assault, firearms possession, and other offenses. The jury convicted Harris of the lesser included offense of voluntary manslaughter and other charges and the trial court sentenced him to 20 years to serve, followed by 5 years on probation. Following the denial of his motion for new trial, Harris appeals, arguing that his trial counsel was ineffective for withdrawing his requested charge of defense of habitation. For the reasons that follow, we conclude that the trial court did not abuse its discretion in concluding that trial counsel's decision to withdraw that defense was not deficient performance, and affirm.

1. Harris was indicted for felony murder for causing the victim's death by shooting while committing the offense of possession of a handgun by a convicted felon, and for felony murder for causing the victim's death by shooting while

committing the offense of aggravated assault.[1] The jury found him not guilty of the first count of felony murder and guilty of the lesser included offense of voluntary manslaughter in the second count of felony murder.

> Although [Harris] does not dispute that the evidence is legally sufficient to sustain his convictions, we nevertheless review the record and independently assess the legal sufficiency of the evidence. In doing so, we apply the familiar standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979), asking whether any rational trier of fact could find beyond a reasonable doubt from the evidence adduced at trial that [Harris] is guilty of the crimes of which he was convicted. See 443 U. S. at 319 (III) (B).

*White v. State*, 293 Ga. 523, 523 (1) (753 SE2d 115) (2013).

So viewed, the evidence showed that Harris and his nephew lived in the same house, and the victim was a friend of Harris's who came over nightly and sometimes stayed at the house. Another friend of Harris's testified that he went to the house that evening hoping to get high on cocaine, which he usually bought from the nephew. Harris let him in, and the friend heard the victim back in the nephew's bedroom

---

[1]Harris was also convicted of aggravated assault, which merged into the voluntary manslaughter conviction, two counts of possession of a firearm during the commission of a crime, one of which the trial court directed a verdict of acquittal, making a false statement, and tampering with evidence, and acquitted of possession of a firearm by a convicted felon.

"yelling in general about some female." The friend went back and suggested that the victim step out of the bedroom to let the nephew dress, and the victim responded that he was going to confront Harris about money Harris owed him.

The victim went into the living room where Harris was lying on the couch and began jabbing him with a six- to seven-foot stick about the size of a closet rod, so the friend stepped between Harris and the victim. After the victim hit the friend in the face, the friend finally wrested the stick away, threw it down, and announced his intention to leave the house. Harris got up from the couch and the friend pushed the victim to the doorway, trying to get him to leave, but the friend was unable to control the victim by himself. The nephew ran out the door, and as the friend yelled for the nephew to come back and help defuse the situation, the victim "got upset again," walked back into the house, and confronted Harris a second time.

The friend heard the victim screaming and cursing at Harris but could see only Harris. He saw a flash, heard a pop, and then heard the victim stumbling back towards the bedroom. The friend went to the victim, who said, "Don't let him shoot me again." The friend saw an object in Harris's hand, but could not tell if it was a gun or not. The friend tried to get the victim to lie down while directing Harris, whom he described as "hysterical," to call 911. The friend finally dialed 911 himself and

3

handed the phone to Harris, although he did not actually hear Harris speak to an operator. The friend finally managed to get the victim to lie down and then left the scene within two minutes of the shooting, explaining that he was high and frantic and did not know what to do.

The nephew testified that he saw the victim in the living room hitting Harris with a stick and offered to pay the victim whatever Harris owed "just to keep the commotion down." The victim responded, "Bump you, I don't want your money. Somebody [sic] going to die tonight." The nephew confirmed that the friend got between Harris and the victim, but the victim kept swinging his stick and hitting both men until Harris "staggered up out of there and that's when the gun went bang." The nephew testified that Harris was standing by the kitchen and shot the victim when the victim rushed Harris with the stick again. The nephew also testified that after the friend took Harris's gun and left with it, Harris called the police. The nephew admitted he left the scene too.

A 911 supervisor testified that an operator received an emergency call at 3:12 a.m. from a man later identified as Harris. The supervisor prepared a report that quoted the caller as saying, "Its [sic] been an accident, send the police" and noted that the caller then hung up and no one answered a call back. A patrol officer was

4

dispatched two minutes later and responded six minutes after that to find Harris alone in the house with the victim, who was lying on a bedroom floor with his pants down around his knees.

The victim appeared to be dead, and the officer testified that there was "blood everywhere in the room," some of which had already dried. Harris initially told the responding officer that the victim had been shot by another man, but later admitted having shot the victim himself. In his second statement, Harris told the police that the victim came to the house and woke him with a stick. Harris said he went to the kitchen, pulled a gun from the drawer, and shot the victim in self-defense.

A paramedic who responded to the scene testified that the victim had been shot in the chest and his skin temperature was cool. Congealed blood was on the floor, and the paramedic testified that it normally took about two hours for blood to congeal. Also, rigor mortis was setting into the victim's body, and that generally occurred from about an hour and a half to two hours after death. A crime scene investigator testified that he found a mop with bloody fingerprints on the handle sitting in a bucket of dark water at the scene, and a latent print examiner with the GBI testified that she matched a print from the mop handle to Harris. The medical examiner testified that the victim was shot in the chest from a few feet away, and the bullet struck the victim's

5

pulmonary artery, causing massive internal bleeding and death within five to ten minutes.

The jury could have determined that after the friend took the victim's stick away, the victim had stopped his attack on Harris, and that Harris's actions in going into his kitchen, pulling a gun from the drawer, and shooting the victim in the chest were disproportionate to the threat presented. See OCGA § 16-3-21 (a) (person justified in using force intended or likely to cause death or great bodily harm only if he reasonably believes such force necessary to prevent death or great bodily injury to himself) Further, Harris's initial statement to the police in which he lied about someone else having shot the victim, along with evidence that he altered the crime scene, disposed of the handgun, and called the police only after the victim's blood had congealed and rigor mortis had set in, could be viewed by a rational jury as consciousness of guilt. *Sweet v. State*, 278 Ga. 320, 325 (7) (602 SE2d 603) (2004) (attempt to blame another for shooting victim was relevant as evidence of consciousness of guilt); *White v. State*, 127 Ga. 273, 275 (56 SE 425) (1907) ("The conduct of a person charged with a crime, indicating a consciousness of his guilt, is relevant evidence against him.")

6

Considering all of the evidence as summarized above, it was sufficient to authorize a rational jury to find Harris guilty of voluntary manslaughter and the other offenses of which he was convicted. *Neverson v. State*, 324 Ga. App. 322, 323-324 (1) (750 SE2d 397) (2013).

2. Harris argues that his trial counsel was ineffective for withdrawing his request to charge the jury on defense of habitation under OCGA § 16-3-21. The State responds that the defense was not supported by the evidence and that trial counsel made a reasonable strategic decision to pursue a defense of only justification.

A person accused of a crime has a right to the effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686 (104 SCt 2052, 80 LE2d 674) (1984). *Strickland* established a two prong test for a claim of ineffective assistance of counsel: first, the appellant must show that counsel's performance was deficient, and second, the appellant must show that counsel's deficient performance prejudiced his defense. Id. at 687. "[T]he burden is on the defendant to make both showings, and ... a reviewing court could find lack of sufficient prejudice without deciding whether counsel's performance was deficient" or vice-versa. *Smith v. Francis*, 253 Ga. 782, 783(1) (325 SE2d 362) (1985).

7

In deciding whether trial counsel's performance was deficient under the first prong of *Strickland*, Georgia has followed most federal and state courts and adopted the "reasonably effective assistance" standard, which asks whether counsel's assistance was reasonable considering all of the circumstances. *Smith*, 253 Ga. at 783 (1). This standard also entitles counsel to "a strong presumption . . . that counsel's conduct falls within the wide range of reasonable professional conduct and that all significant decisions were made in the exercise of reasonable professional judgment." Id. We review a trial court's decision on an ineffective assistance claim for abuse of discretion. *Robinson v. State*, 332 Ga. App. 240, 251 (5) (b) (771 SE2d 751) (2015).

Here, the trial court reviewed the evidence and found that Harris's trial counsel was an experienced and seasoned criminal defense attorney whose testimony at the motion for new trial hearing was credible. The court found that the victim attacked Harris rather than Harris's habitation, that self-defense was an appropriate defense, and that trial counsel "reasonably and strategically" decided to withdraw his request for a jury charge on defense of habitation and proceed with only a self-defense claim.

Trial counsel submitted the following request to charge:

One who is not the aggressor is not required to retreat before being justified in using such force as is necessary for personal defense or in

using force that is likely to cause death or great bodily harm if one reasonably believes such force is necessary to prevent death or great bodily injury to oneself or a third person or to prevent the commission of a forcible felony.

During the charge conference, trial counsel withdrew that request without discussion, later explaining at the motion for new trial hearing that "the way the case played out at trial, it was pretty much an accepted fact that [the victim] stayed there regularly. He was sort of like an extended member of the family. And at the time of the incident, [the victim] was acting kind of crazy . . . which led to the incident, versus [the victim] being an intruder."

Trial counsel testified at the new trial hearing that he was familiar with the defenses of justification or self-defense and habitation, and knew that there was case law that allowed for the defense of habitation "whether the victim was a common guest or not." Here, his recollection was that "originally [the victim] came at Mr. Harris with a stick, struck him on the nose, causing some minor injury. And then after it diffused [sic] somewhat, [the victim] then became belligerent again and came after Mr. Harris, and Mr. Harris retreated and got a gun and shot him," as opposed to the victim having come straight into the house. Trial counsel further explained, "[A]t the time of the incident [the victim] didn't fit the classic pattern of being an intruder,

9

which is why I settled with going solely with self-defense versus going with self-defense and then defense of habitation," and made the decision to withdraw the charge of defense of habitation.

Harris first argues that his trial counsel's withdrawal of the defense of habitation defense constituted deficient performance, satisfying the first prong of the *Strickland* test. He contends that the evidence could have supported a charge on defense of habitation, and therefore trial counsel's failure to ask for such a charge constituted deficient performance. The issue here is not, however, whether "any evidence, however slight" would have supported the charge, as it was in *Hendrix v. State*, 268 Ga. App. 455, 456 (1) (602 SE2d 133) (2004) (no error in trial court's sua sponte decision to charge the jury on self-defense, because some evidence supported it). Rather, the issue is whether trial counsel was deficient for focusing on what he thought was the stronger defense.

The statute on defense of habitation, OCGA 16-3-23, provides:

A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to prevent or terminate such other's unlawful entry into or attack upon a habitation; however, such person is justified in the use of force which is intended or likely to cause death or great bodily harm only if:

(1) The entry is made or attempted in a violent and tumultuous manner and he or she reasonably believes that the entry is attempted or made for the purpose of assaulting or offering personal violence to any person dwelling or being therein and that such force is necessary to prevent the assault or offer of personal violence;

(2) That force is used against another person who is not a member of the family or household and who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using such force knew or had reason to believe that an unlawful and forcible entry occurred; or

(3) The person using such force reasonably believes that the entry is made or attempted for the purpose of committing a felony therein and that such force is necessary to prevent the commission of the felony.

The key to this defense is that the resident defendant had to use force either to prevent or terminate an unlawful *entry into* or *attack on* the defendant's residence. Additionally, the use of deadly force is only defensible if the victim entered or tried to enter "in a violent and tumultuous manner," "unlawfully and forcibly," or for the purpose of committing a felony.

Here, Harris admitted to the police that the victim stayed with him periodically, that the victim had come over that night to drink, and that Harris had let him inside through the front door. Harris's friend testified that when he came to the house, the victim was already back in the nephew's bedroom. The nephew also testified that the

11

victim was at the house "like every night" and sometimes stayed there. The record contains no evidence that the victim entered violently, unlawfully, forcibly, or with the intent to commit a felony.

Harris argues that the victim's "refusal to cross the threshold" and leave the premises, coupled with his continued efforts to assault "was a violent and tumultuous entry for the purposes of violence to persons within the home" and supported a charge on defense of habitation under OCGA § 16-3-23. But

> [t]he statute is clearly concerned with the use of deadly force to counter entry, or attempted entry, into the home..., and there is no evidence that [the victim] made any threats against the habitation. Further, he was there as a guest of [Harris], who was a resident of the [house], and defense of habitation is not a defense available to a defendant when the victim is a guest in the home.

*Stobbart v. State*, 272 Ga. 608, 612 (4) (533 SE2d 379) (2000). See also *Reese v. State*, 289 Ga. 446, 447 (2) (711 SE2d 717) (2011) (no error in failing to charge defense of habitation absent evidence victim made unlawful entry into or attack on house, victim entered in violent manner, or defendant reasonably believed victim intended personal violence); *Neverson v. State*, 324 Ga. App. at 325 (2) (defense of

12

habitation unavailable when evidence established victim was present on porch as guest and refused to leave).

Harris points out that our Supreme Court found trial counsel ineffective for failing to request a charge on defense of habitation in *Benham v. State*, 277 Ga. 516, 517-518 (591 SE2d 824) (2004). But in *Benham,* the "victim" had been assaulting the defendant through an open window while attempting to enter the defendant's car (which constitutes a "habitation" under OCGA § 16-3-24.1). Trial counsel testified that she requested only a charge on self-defense and not on defense of habitation because she wanted the jury to believe that the defendant had feared for her safety and was not "merely protecting her vehicle." Id. at 517. The court found that trial counsel did not "appreciate that the defense of habitation may have justified the use of deadly force in this case even if that amount of force was not necessarily required to repel [the other woman's] attack," because the woman had attempted entry in a violent or tumultuous manner for the purpose of assaulting the defendant. Id. Thus, trial counsel's failure "to adequately research and understand the defenses available to the defendant" constituted deficient performance. Id. at 517-518 (1).

Similarly, in *Robison v. State*, a victim was entitled to use force against the defendant, who was initially in the house as a guest, because the defendant left the

house when asked to, retrieved a meat cleaver from his car, and returned to chase the victim into his bedroom. 277 Ga. App. 133, 133-134 (625 SE2d 533) (2006). The defendant's re-entry into the habitation was violent and tumultuous, and the victim reasonably believed he was returning to assault him. Id. at 134. In contrast, the victim in this case was invited into the house and never left. Because the uncontroverted evidence adduced at trial would not have authorize a charge of defense of habitation, the trial court committed no abuse of discretion in finding that trial counsel's withdrawal of that charge was not deficient performance.

Absent a finding of deficient performance, we need not consider whether withdrawing the defense of habitation charge prejudiced Harris's defense.

*Judgment affirmed. Boggs and Rickman, JJ., concur.*